**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**November 13, 2012**

# In the Court of Appeals of Georgia

A12A0815. RAY et al. v. CITY OF GRIFFIN et al.

PHIPPS, Presiding Judge.

In this tort action, Danny and Gwenell Ray appeal the dismissal from suit of City of Griffin police officer Gene Mathews, in his official capacity, and the grant of summary judgment to the City of Griffin. Danny Ray claims he was injured when the vehicle he was driving was struck by a vehicle driven by a suspect being pursued by Mathews. Gwenell Ray, Danny Ray's wife, sued for loss of consortium.

Finding that OCGA § 36-92-3 foreclosed the Rays from recovering against Mathews, the trial court dismissed Mathews from the case as a party defendant. The trial court granted summary judgment to the City based on OCGA §§ 40-6-6 and 24-9-85 (b). Because we agree that under OCGA § 36-92-3 recovery from Mathews was foreclosed, we affirm the trial court's dismissal of Mathews from the case. But

because the Rays presented evidence from which a jury could find that Mathews recklessly disregarded proper law enforcement procedures in his pursuit of the suspect, we find that the trial court erred in granting summary judgment to the City. Accordingly, we affirm the trial court's dismissal of Mathews and reverse the grant of summary judgment to the City.

1. The Rays contend that the trial court erred in concluding that OCGA § 36-92-3 barred them from recovering against Mathews in his official capacity and thus, dismissing Mathews from the case.[1]

"When a question of law is at issue, as here, we owe no deference to the trial court's ruling and apply the plain legal error standard of review."[2]

OCGA § 36-92-3 (a) and (b) provide:

(a) *Any local government officer or employee who commits a tort involving the use of a covered motor vehicle while in the performance of his or her official duties is not subject to lawsuit or liability therefor.*

---

[1] The Rays contend also that the trial court erred in concluding that OCGA § 36-92-3 barred them from recovering against the City. The trial court, however, did not address the issue of whether the Rays were barred under OCGA § 36-92-3 from recovering against the City. Therefore, we do not address that contention.

[2] *Suarez v. Halbert*, 246 Ga. App. 822, 824 (1) (543 SE2d 733) (2000) (citations and punctuation omitted); *Hardin v. Phillips*, 249 Ga. App. 541 (547 SE2d 565) (2001) (deciding whether a litigant is entitled to immunity is a question of law).

2

Nothing in this chapter, however, shall be construed to give the local government officer or employee immunity from suit and liability if it is proved that the local government officer's or employee's conduct was not within the performance of his or her official duties.

(b) *A person bringing an action against a local government entity under the provisions of this chapter* shall name as a party defendant the local government entity for which the officer or employee was acting and *shall not name the local government officer or employee individually. In the event that the local government officer or employee is individually named for an act for which the local government entity is liable under this chapter, the local government entity for which the local government officer or employee was acting shall be substituted as the party defendant.*[3]

The Rays sued Mathews in his individual capacity and in his official capacity. Within four months of filing the complaint, however, they dismissed their suit against Mathews in his individual capacity. Thus, we do not discuss the doctrine of official (qualified) immunity, which offers public officers and employees limited protection from suit in their personal capacity.[4]

---

[3] (Emphasis supplied.)

[4] See *Cameron v. Lang*, 274 Ga. 122, 123 (1) (549 SE2d 341) (2001) (qualified immunity protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness,

In dismissing Mathews from the case, the trial court relied on, inter alia, *DeLoach v. Elliott*.[5] In that case, the Supreme Court of Georgia addressed the grant of summary judgment in favor of a police officer in his individual capacity under the provisions of OCGA § 36-92-3. In doing so, "due to the nearly identical language between OCGA § 50-21-25 and 36-92-3,"[6] the Court analogized OCGA § 36-92-3 to OCGA § 50-21-25 (the Georgia Tort Claims Act immunity statute for state employees), and held that by the passage of OCGA § 36-92-3, "the legislature intended to foreclose *all* recovery against municipal employees for torts committed within the scope of employment and involving the use of a covered motor vehicle."[7]

OCGA 50-21-25 § (a) and (b) provide:

(a) This article constitutes the exclusive remedy for any tort committed by a state officer or employee. *A state officer or employee who commits a tort while acting within the scope of his or her official duties or employment is not subject to lawsuit or liability therefor.* However,

---

malice, or corruption; under Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure).

[5] 289 Ga. 319 (710 SE2d 763) (2011).

[6] Id. at 322 (1).

[7] Id. (emphasis supplied).

4

nothing in this article shall be construed to give a state officer or employee immunity from suit and liability if it is proved that the officer's or employee's conduct was not within the scope of his or her official duties or employment.

(b) *A person bringing an action against the state under the provisions of this article* must name as a party defendant only the state government entity for which the state officer or employee was acting and *shall not name the state officer or employee individually. In the event that the state officer or employee is individually named for an act or omission for which the state is liable under this article, the state government entity for which the state officer or employee was acting must be substituted as the party defendant.*[8]

Citing OCGA § 50-21-25, this court has held that a state actor sued in his official capacity is immune from suit if he acted within the scope of his official duties.[9]

---

[8] (Emphasis supplied.)

[9] See *Bd. of Regents of the Univ. System v. Frost*, 233 Ga. App. 692, 693-694 (1) (505 SE2d 236) (1998) (trial court erred in not dismissing suit against state officer sued in his official capacity because officer was entitled to immunity under OCGA § 50-21-25); *Datz v. Brinson*, 208 Ga. App. 455-456 (1) (430 SE2d 823) (1993) (trial court properly dismissed suit filed by inmate against correction officers and officials in their official capacity under OCGA § 50-21-25).

In determining whether the trial court properly dismissed Mathews in his official capacity from suit, we look to the nearly identical language of the pertinent provisions of OCGA § 36-92-3 (a) and (b), and OCGA § 50-21-25 (a) and (b), as emphasized above. Analogizing OCGA § 36-92-3 (a) and (b) to OCGA § 50-21-25 (a) and (b), as the Supreme Court has done, and considering applicable case law, we conclude that the trial court properly dismissed Mathews from the suit.[10]

2. The Rays contend that the trial court erred in granting summary judgment to the City[11] because genuine issues of material fact remain as to whether, under OCGA § 40-6-6 (d) (2), Mathews acted with reckless disregard of proper law enforcement procedures, and his actions were thus the proximate cause of the collision between the fleeing suspect and Danny Ray.

---

[10] *DeLoach*, supra; *Bd. of Regents of the Univ. Sys.*, supra; *Datz*, supra.

[11] See *Cameron*, supra at 126-127 (3) (the doctrine of sovereign immunity, also known as governmental immunity, protects all levels of governments from legal action unless they have waived their immunity from suit; municipal corporations may be liable for a city employee's negligence in performing their job to the extent the city has waived its governmental immunity through the purchase of liability insurance). The City's vehicle which Mathews drove was covered by the City with liability insurance, and therefore, sovereign immunity was waived for purposes of the Rays' suit against the City. See also *Standard v. Hobbs*, 263 Ga. App. 873, 878 (2) (589 SE2d 634) (2003).

[S]ummary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. To obtain summary judgment, a defendant need not produce any evidence, but must only point to an absence of evidence supporting at least one essential element of the plaintiff's claim. We apply a de novo standard of review to an appeal from a grant of summary judgment and view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.[12]

Because the record shows that summary judgment was not authorized, we reverse the grant of summary judgment to the City.

OCGA § 40-6-6 (d) (2) provides:

When a law enforcement officer in a law enforcement vehicle is pursuing a fleeing suspect in another vehicle and the fleeing suspect damages any property or injures or kills any person during the pursuit, the law enforcement officer's pursuit shall not be the proximate cause or a contributing proximate cause of the damage, injury, or death caused by the fleeing suspect unless the law enforcement officer acted with reckless disregard for proper law enforcement procedures in the officer's decision to initiate or continue the pursuit. Where such reckless disregard exists, the pursuit may be found to constitute a proximate cause of the damage, injury, or death caused by the fleeing suspect, but

---

[12] *Whitley v. Piedmont Hosp*., 284 Ga. App. 649, 653 (1) (644 SE2d 514) (2007) (citations omitted).

7

the existence of such reckless disregard shall not in and of itself establish causation.

The Rays alleged in their complaint that Danny Ray was injured as a result of an "irresponsible and reckless police chase." They alleged that Danny Ray drove his vehicle on a roadway "[a]t the same time . . . Mathews with reckless disregard for the public[']s safety was pursuing a vehicle driven by [another individual]." The Rays alleged that "[d]uring the pursuit, [Danny] Ray was t-boned causing his vehicle to overturn," and that Danny Ray was seriously injured.

The Rays alleged that Danny Ray was injured as a direct and proximate result of Mathews's negligent and reckless actions and omissions, and that the City was liable for the actions of its officers, in this case Mathews. Specifically, the Rays alleged that the acts of negligence and recklessness included, but were not limited to, the following: that Mathews was following too closely, in violation of statutory law and other applicable law; that Mathews struck an individual's vehicle and caused it to lose control and strike Danny Ray; that immediately prior to the collision Mathews failed to take evasive action; that immediately prior to the collision, Mathews "failed to warn"; and that immediately prior to the collision, Mathews failed to keep a proper lookout.

8

The City and Mathews answered, denying liability and asserting the defenses of, among other things, sovereign immunity, official immunity,[13] and lack of proximate cause under OCGA § 40-6-6. Discovery ensued; depositions were taken.

The police department's Standard Operating Procedures ("SOP") manual was submitted. The SOP manual provided, among other things, that: 1) no officer shall initiate a high speed motor vehicle pursuit of any vehicle which, at the time of the contact, is known only to have committed a traffic or misdemeanor offense; 2) during pursuit, deliberate physical contact between vehicles such as bumping or ramming is considered lethal force and will not be justified at any time; 3) the operator of a police vehicle operating under emergency procedures shall drive with care and due regard for the safety of others, and police vehicles operating under emergency conditions shall utilize emergency lights and siren to warn other vehicles and pedestrians along the route; 4) a police vehicle operating under emergency conditions may exceed the posted speed limit so long as life or property are not endangered; 5) when the operator of a pursued vehicle increases his speed or drives in such a manner as to endanger the safety of others, the pursuing officer shall immediately and continuously use both the blue lights and the siren throughout the pursuit; and 6) the initial officer

[13] See Division 1, supra.

shall terminate pursuit when the gravity of the offense and the prospect of losing the suspect will not balance with the hazards to the officer and public.

The City and Mathews moved for summary judgment, asserting that this action was barred against Mathews in his official capacity;[14] and that Mathews's actions were taken with due regard for proper law enforcement procedures and as such, could not legally or factually be the proximate cause of the injuries Danny Ray suffered.

In moving for summary judgment, the City and Mathews asserted that on July 17, 2008, Mathews and another officer were on patrol in a marked vehicle when they observed a vehicle that Mathews had, three days before, seen parked at a residence known to local police officers as a place where illegal drugs had been sold and used; at that prior time, dispatch reported that the Georgia Crime Information Center showed that the vehicle's tag number was not on file. When Mathews saw the vehicle on July 17, 2008, he followed it while inquiring again about the vehicle's tag and registration. The officers followed the vehicle for several blocks, then they observed it fail to stop before turning right at a red light, fail to maintain its lane of travel, and accelerate in speed.

---

[14] See Division 1, supra.

As Mathews proceeded up a bridge, he activated the police vehicle's blue lights and siren to initiate a traffic stop. The officers observed that the vehicle was traveling at a high rate of speed, was not stopping, ran a red light, and entered an intersection on the wrong side of the road, colliding with the vehicle being driven by Danny Ray. The City and Mathews asserted that Mathews did not strike the vehicle he was pursuing; did not drive more than ten to twenty miles per hour over the speed limit after he had activated his emergency equipment; did not fail to maintain a proper lookout for traffic and driving conditions; and that when he decided to stop the vehicle, he engaged his emergency equipment, including the flashing blue lights and siren.

On May 21, 2010, the Rays filed a response to the motion for summary judgment, arguing that the City and Mathews were not entitled to summary judgment because, inter alia, Mathews had violated the SOP as listed above. The Rays later filed a supplemental brief in opposition to the motion for summary judgment. They attached to that supplemental brief affidavits executed on July 18, 2010 by the driver and passenger of the vehicle which Mathews had pursued and which had collided with Danny Ray's vehicle.

In his affidavit, the driver stated that as he was driving, he saw a police vehicle turn around and begin to follow him. The driver continued, in pertinent part:

The officer was trying and did catch up with me. I did not know why they were following me. I became scared and began speeding up in my vehicle. I began driving at speeds of over 55 miles per hour in a 30 mile per hour zone and tried to outrun the police. The police were right behind me and were traveling at the same speed I was. The police were driving at least 50 miles per hour at some points during the chase which was in a residential area. I drove through the City down five different streets and made at least six turns trying to get away. When I drove down Sixth Street, the police chased me down Sixth Street. . . . When I took a U-turn by Slaton Avenue, made a right onto . . . drove onto Fifth Street, went through an intersection, and drive onto Solomon Street, the police were chasing me the entire time. At one point, I went through a red light. I did not stop at any intersections or stop lights while the police were pursuing me. The police did not slow down or stop at any intersections or stop lights while they were pursuing me. I accelerated as I approached the Sixth Street Bridge because the police were chasing me. The police officers were right behind me as I crossed over the bridge. At one point, I believe the police car hit the back of the car I was driving. I then lost control and crashed into Danny Ray's vehicle at the intersection of Chappell Street. The only reason I crashed into Danny Ray's vehicle was because the police were chasing me. If the police had not been chasing me, I would not have been speeding through the City and trying to outrun them. I never saw or heard the police running lights

12

or sirens until after I collided with Danny Ray's vehicle. When I slammed into Mr. Ray's vehicle, it flipped over.

The passenger's account was similar to the driver's. The passenger pertinently stated:

As we were driving south on Sixth Street, we saw a police car turn around and begin chasing us. As soon as the officer turned around and started aggressively chasing us, I told [the driver] to stop. [The driver] became scared and began speeding up to get away from the police who were continuing to chase us. He began driving at speeds of 50-60 miles per hour in city streets that are no more than 30 mile per hour areas to outrun the police. [The driver] could not get away from the police, they were right on him and were traveling just as fast. The police had to drive 55-60 miles per hour to stay on our bumper. [The driver], with the police on his tail, drove all through the City down five different streets and made at least six turns trying to get away. When he drove down Sixth Street, the police chased us down Sixth Street. . . . When he took a U-turn by Slaton Avenue, made a right turn . . . drove onto Fifth Street, went through an intersection, and drove onto Solomon Street, the police were chasing him the entire time. At one point, he went through a red light. He did not stop at any intersections or stop lights while the police were pursuing him. The police did stop at any intersections or stop lights while they were pursuing him. I kept looking back and was afraid for my life. [The driver] continued to accelerate as we approached the Sixth Street Bridge because the police were chasing us. The police officers were right behind us as we crossed over the bridge. At one point, near the top of the bridge, there was a bang from what I think was the police car hitting the back of our car. Then a few seconds later, [the driver]

13

crashed into Danny Ray's vehicle at the intersection of Chappell Street. The only reason he crashed into Danny Ray's was because he was speeding and running from the police who kept chasing us. If the police had not been chasing us, [the driver] would not have been speeding through the City and trying to outrun them. I never saw police light or heard sirens until after we collided with Danny Ray's vehicle. When we slammed into Mr. Ray's vehicle, it flipped over.

Subsequent to the execution of these affidavits, the deposition of the driver was taken on September 23, 2010, and of the passenger on October 6, 2010.

The driver's deposition testimony was equivocal; at one point he stated that most of the information in the affidavit was correct, and at other times he denied material statements therein. For instance, on examination by counsel for the City and Mathews, the driver deposed that he was traveling the speed limit and that no high-speed chase had occurred. But then, on examination by the Rays' attorney, the driver deposed: "They was following me. Might as well say they was chasing me."

Contrary to the statement he made in his affidavit, the driver further deposed that the lights on the police vehicle were activated seconds before he collided with Danny Ray's vehicle. The driver stated that he did stop at intersections and at red lights, only once turning right at a red light; that the police vehicle was not "all on my

14

back," that the police vehicle was "probably a car and a half" in length behind him; and that only a few houses were on the route he drove.

The passenger deposed that the affidavit he executed was accurate and truthful. Yet, he deposed, contrary to a statement he had made in his affidavit, that he did not know the driver's rate of speed; that his statement in his affidavit that the driver went through a red light referred to when the driver had made a right turn at a red light, after making a "rolling stop" and looking both ways; that the driver made rolling stops at two lights; and that the police pursuit became a "high speed chase" only "[r]ight before" the collision occurred. The passenger also gave varying accounts of the location, he contended, the police vehicle had struck the vehicle in which he rode.

In ruling on the motion for summary judgment, the trial court held:

> [G]iven the numerous admitted falsehoods contained in [the driver]'s affidavit, OCGA § 24-9-85 (b)[15] applies to this situation. . . . As with [the driver], [the passenger]'s affidavit and deposition testimony are replete with admitted and intentional falsehoods. . . . As with [the driver], the Court will apply OCGA § 24-9-85 (b) and disregard the entirety of [the passenger]'s statements. . . .

---

[15] OCGA § 24-9-85 (b) provides: "If a witness shall willfully and knowingly swear falsely, his testimony shall be disregarded entirely, unless corroborated by circumstances or other unimpeached evidence."

15

We need not address whether the City demonstrated that it was entitled to summary judgment on the merits of the motion because it is clear that the trial court granted the motion based, in part, on its finding that the affidavits and deposition testimony of the driver and passenger as related to the causation issue had been conflicting and false.[16]

> In order to make OCGA § 24-9-85 (b) applicable, it must appear, among other things, that the witness admits, *on the trial*, that he wilfully and knowingly swore falsely, or the testimony must be such as to render the purpose to falsify manifest. Under this rule . . . it has several times been held, that if a witness swears *at the trial* to a certain state of facts in a material matter, and he has previously sworn to the contrary in the same case, and where he admits that his testimony was false, this constitutes a wilful and knowing false swearing, and requires *the jury* to reject his testimony entirely, unless it be corroborated by circumstances or other unimpeached evidence.[17]

---

[16] See *Whitley*, supra at 653-654 (1).

[17] *All Risk Ins. Agency v. Southern Bell &c. Co.*, 182 Ga. App. 190, 192-193 (3) (355 SE2d 465) (1987) (citations, punctuation and emphasis omitted; emphasis supplied).

The trial court essentially applied our state's contradictory testimony rule[18] when it rejected the affidavits and deposition testimony in their entirety.[19] "This is not permitted when the contradictory testimony is of a nonparty witness. . . ."[20] "[S]uch contradictions go solely to the [non-party witness]'s credibility, and are to be assessed by the jury when weighing the [non-party witness]'s testimony."[21] The trial court made findings it was not authorized to make when considering motions for summary judgment;[22] such findings are reserved for juries in this state.[23]

---

[18] See *Prophecy Corp. v. Charles Rossignol*, 256 Ga. 27, 28 (1) (343 SE2d 680) (1986) (the testimony of a party who offers himself as a witness in his own behalf at trial is to be construed most strongly against him when it is self-contradictory, vague or equivocal; where the favorable portion of a party's self-contradictory testimony is the only evidence of his right to recover or of his defense, the opposing party is entitled to a directed verdict).

[19] See *Whitley*, supra at 654 (1).

[20] Id.; *Thompson v. Ezor*, 272 Ga. 849, 852-853 (2) (536 SE2d 749) (2000) (affirming *Ezor v. Thompson*, 241 Ga. App. 275, 277-278 (1) (526 SE2d 609) (1999) (self-contradictory testimony rule, in passing upon a motion for summary judgment, applies to the testimony of party witnesses and not non-party witnesses).

[21] *Thompson v. Ezor*, supra at 853 (2) (noting *Furse v. O'Kon*, 153 Ga. App. 703-704 (2) (266 SE2d 343) (1980); OCGA §§ 24-9-80, 24-9-85); *Ezor v. Thompson*, supra at 278 (1).

[22] *Whitley*, supra.

[23] Id.; OCGA § 24-9-80 (credibility of a witness is a matter to be determined by the jury under proper instructions from the court).

Consequently, notwithstanding the inconsistencies in the affidavits and deposition testimony, the trial court should have given the Rays "the benefit of the most favorable version of such testimony as a whole which the jury would be authorized to accept."[24] Giving the Rays the benefit of all reasonable doubt and the construction of the evidence and all inferences and conclusions therefrom most favorably as the parties opposing the motion,[25] the driver's and passenger's affidavits were sufficient to create genuine issues of material fact regarding whether Mathews acted with reckless disregard for proper law enforcement procedures in his pursuit, which may be found to constitute a proximate cause of Danny Ray's injuries.[26] Accordingly, the trial court erred in granting summary judgment to the City.

*Judgment affirmed in part and reversed in part. Ellington, C. J., concurs. Dillard, J., concurs in the judgment.*

---

[24] *Whitley*, supra at 655 (1) (citation and punctuation omitted).

[25] *Moore v. Goldome Credit Corp.*, 187 Ga. App. 594, 596 (370 SE2d 843) (1988).

[26] See *Whitley*, supra; *Rahmann v. Dekalb Co.*, 300 Ga. App. 572, 574-576 (685 SE2d 472) (2009).